Riohakdson, J.,
delivered the opinion of the court:
The first question of law which arises in this case is upon the admissibility of certain evidence offered by the defendants.
Mr. Johnston, of the Attorney-General’s Office, in behalf of the United States, produced in court from the rebel archives in possession of the Treasury Department, as was admitted, two *241 bills of sale, purporting to be signed by the claimant, and conveying to the Confederate States the cotton which is the subject of this suit, and requested the court, sitting as jurors, to compare the signatures thereto with the admitted signature of the claimant to his petition in this case; and if the signatures should be found to be in the same handwriting, to admit the documents in evidence. '
If this were a new question, to be decided upon principle alone, it might be difficult for us to come to the conclusion that the bills of sale could be admitted upon such a comparison without the aid of the testimony of persons who had seen the claimant write, or of experts competent to give an opinion upon the question whether or not the several documents were in the-handwriting of the same person. But the weight of authority seems clearly to be that where other writings, admitted or proved to be genuine, are already in the case and not put in for the purpose of instituting a comparison, the jury may, with or without the aid of experts, compare the handwriting of documents offered in evidence therewith, and determine their genuineness by such comparison. The same question was before this court, and so decided in Medio ay's Case, in which all the authorities at that time on each side were ably reviewed by the judges who delivered opinions. We now all adhere to the ruling of the court in that case, andffigain hold, upon authority, that such comparison may bo made by the court. (Medway v. The United States, 6 C. Cls., R., 421; 2 Ph. Ev., 4th Am. ed., 615) 1 Greenl. Ev., § 578; Randolph v. Laughlin, 48 N. Y., 640; Morey v. Safe Deposit Company, 34 N. Y., 153.)
This did not dispense with the necessity of proving delivery of the bills of sale, which was sufficiently proven by the fact that they were found in possession of the rebel government, among its archives obtained by the United States since the fall of the rebellion, in connection with other evidence in relation to the sale of the cotton by the claimant.
This is the second instance only in which exception has been taken by counsel to the ruling of this court made during the progress of a trial, with the view of, having such ruling passed upon by the Supreme Court on [appeal or otherwise. The first was in Medway's Case, before cited, which was carried up on appeal, but was decided on other grounds, so that the question is still an open one how, if at all, such rulings can be *242 reviewed by the Supreme Court. The Act March 3, 1863, (12 Stat. L., p. 765, § 5,) gives to parties the right of appeal, with certaiu limitations, “ from any final judgment or decree which may hereafter be rendered in any case by said court * * * under such regulations as the said Supreme Court may direct.” Ho provision is made for a bill of exceptions or writ of error, and it is clear that they cannot be resorted to in relation to any of the proceedings of this court.
Generally an appeal vacates the original judgment; the case is tried in the appellate court de novo, upon the facts as well as the law, and the rulings of the court below become immaterial. And such would be the effect of appeals from this court but for the rules of the Supreme Court applicable thereto, made under the authority of the statute. The Act March 3, 1863, (§ 11,) seems to imply that the jurisdiction of the Supreme Court on appeal is to be confined to questions of law, and so that court has limited it by the following rule:
“ In all cases hereafter decided in the Court of Claims, in which, by the act of Congress, such appeals are allowable, they shall be heard in the Supreme Court upon the following record, and none other:
u 1. A transcript of the pleadings in the case, of the final judgment or decree of the court, and of such interlocutory orders, rulings, judgments, and decrees as may be necessary to a proper review of the case.
u 2. A finding by the Court of Claims of the facts in the case established by the evidence, in the nature of a special verdict, but not the evidence establishing them; and a separate statement of the conclusions of law upon said facts on which the court founds its judgment or decree,* the finding of facts and conclusions of law to be certified to this court as part of the record.”
Decisions of the court upon the admissibility of evidence and orders governing the manner of conducting atrial are not such facts in the case as are contemplated by the second paragraph of the rule upon which the conclusions of law are to be made. Such decisions and orders may be spread upon the record, and a transcript of the same may be sent up to the Supreme Court, on appeal from the final judgment or decree, under the first-paragraph of the rule. In this case, in addition to entering the ruling on the record specifically, we have, at the request *243 of the claimant’s counsel, incorporated it with the findings of facts, that either in one form or the other he may have the benefit of his objection, and that the Supreme Court may determine the proper form of presenting such objections in future cases, if the court decide to entertain them at all.
Previously to the date of the bills of sale the cotton belonged to the claimant, having been raised on his, plantation, and the court finds that during the rebellion he sold the same to the Confederate States; that he was paid the value thereof in Confederate bonds, according to agreement 5 and that, upon such sale andpayment, the cotton in bales was weighed, marked, numbered, and deposited on his plantation as Confederate property, the claimant agreeing with the Confederate States to take care of the same while it was on his plantation and to deliver it at his own expense at Crawford, to the order of the rebel secretary of the treasury or his agents or their assigns. This was, according to well-settled principles ¿very where recognized, a complete sale and delivery of the cotton, by which the ven-dees acquired a perfect title to the property, with the right of possession, if not the possession itself, and no right or claim thereto remained in the vendor as against the Confederate States. (Chit, on Con., 10th Am. ed., 393; Story on Con., §§ 799-809 ¡ 2 Pars, on Con., eh. 4, § 15; Benj. on Sales, 220-262; Beauchamp v. Comfort, 42 Miss., 94; Woodruff v. United States, 7 C. Cls. R., 605.)
The claimant became the bailee of the cotton for the Confederate States, without interest, agreeing to take care of the property for the bailors, but that gave him no right, even of possession, against them. This he understood, for when the cotton was claimed and seized, as Confederate property belonging to the defendants, by an agent to collect Government cotton, he made no objection to that claim, and did not set up a right to the cotton as his own private property.
In Beauchamp, plaintiff in error, v. Comfort, (above cited,) the facts were these: Comfort purchased of Beauchamp five specific bales of cotton, and paid for the same in Confederate notes, the seller giving a receipt therefor, and therein agreeing “to keep said cotton in good order, and deliver the same to said Comfort or his order whenever called upon.” The court held this to be a valid executed contract, and the judge who delivered the opinion in the case says : “It must be borne in *244 mind that this was an action to recover tbe value of tbe cotton left by tbe defendant in error with tbe plaintiff in error as bailee, wbicb he failed and refused to deliver according to contract, and not on tbe contract of sale, wbicb has been fully completed and executed by designating tbe particular number of bales and pounds of cotton sold, and by the written acknowledgment of tbe receipt of tbe purchase-money in full. In tbe case of Frazer v. Robinson and Daniel, at tbe present term, we have held that where a contract based upon Confederate money as tbe consideration bad been executed, this court could not disturb it, and that it was a good and valid consideration in such eases. The sale in this case being complete, and tbe contract of sale entirely executed, tbe relation of vendor and ven-dee no longer existed between tbe parties, but that of bailor and bailee without reward.”
A vendor who sells personal property for cash, notes, or other property may undoubtedly retain possession until the consideration agreed upon is received by him • and one who sells on credit and accepts bills of exchange or other evidences of indebtedness therefor, if there be a failure of consideration while be is in possession, may retain tbe property until tbe consideration is made good, or if tbe property be in transitu be has tbe right of stoppage for tbe same purpose; and a bailee for hire may have a lien on the goods in bis bands for payment of bis claim for services, and may maintain possession until bis lien is discharged by payment.
But none of these principles apply, in this case. Here the consideration agreed upon bad been fully paid in Confederate bonds, and at tbe time and place of sale these bonds were a legal and valid consideration to support an executed contract, even under tbe laws of the United States. (Planters’ Bank v. Union Bank, 16 Wall., 484.)
There has been no failure of consideration shown in the evidence. That Confederate bonds are now everywhere worthless is a historical fact; but at the time of their acceptance by tbe claimant they bad a market value in tbe State in wbicb be received them and elsewhere, and either because be sold tbe bonds for other property of more permanent value or they were paid before the suppression of tbe rebellion or other like reason, be makes no attempt to account for them. If tbe claimant negotiated tbe bonds while they had a market value, and *245 they became worthless in the hands of other owners, he cannot set up that fact as a failure of the consideration of the sale of the cotton, for the payment of which he accepted the bonds. In Whitfield’s Case, (9 C. Cls. R., 276,) this court went still further, and held that the claimant, who sold cotton to the Confederate States for Confederate bonds, and retained possession of the property until it was seized by the United States, could not recover the proceeds of the cotton in the United States Treasury, even although he continued to own the bonds, and they became worthless in his hands and he brought them into court.
Nor has the claimant any lien as bailee, for he agreed to take care of the cotton while it was on his plantation, and to deliver it to the Confederate States at his own expense.
The petitioner’s counsel urges that because the claimant agreed to deliver the property at Crawford, a place distant from his plantation, the Confederate States had only a right of action against him for non-delivery of the cotton; that such right of action was all that passed to the United States as successors to the Confederate government; and that the contract with the Confederate States was against public policy, and void, and cannot be enforced or relied upon in the courts of the United States. To this there are two answers, either of which is sufficient:
1. The agreement to deliver the cotton at Crawford was not a condition-precedent to the sale, nor to the passing the title to the Confederate States, nor even to the right of possession by them, but was an independent agreement in addition to the sale, and which the Confederate States or their successors might waive. The latter, having the right of immediate possession, could enforce that right themselves by taking possession of the cotton wherever they could find it, and were not bound to wait until the claimant delivered the same to them at Crawford, nor to rely'exclusively upon his agreement to deliver it there.
2. This is not an action by the United States to recover damages for the non-delivery of cotton, nor a bill for the specific performance of a contract, nor an action to obtain possession of the cotton in any form, wherein the United States are seeking to enforce for their own benefit an unexecuted contract with the Confederate States. The question whether or not an *246 unexecuted agreement between a subject of the United States and the late Confederate States can be enforced in the courts of this country does not arise in this case.
The petitioner’s counsel claims in his brief that Blewett retained the right of possession, and relies upon Woodruff v. The United States, (7 C. Cls. R., 605.) But the decision in that case does not support his position. Judge Boring, in delivering the opinion of the court, says: “In the common law of England the sale of a personal chattel is the transfer of the ownership for a price, and that ownership is made up of two rights, viz, the right of property and the right of possession, and these rights are so distinct that they pass by different means and at different times, and in every sale they are in different persons at the same time. The right of property passes first, and by the mere agreement of the parties in the contract of sale. The right of possession passes afterward, and by delivery of the thing sold, or payment.” In the case at bar, payment having been made, both rights had passed to the Confederate States.
That the United States became the lawful owners of all the personal property of the late Confederate government which came into their possession during the rebellion by capture or otherwise, and of all personal property which said pretended or defacto government owned at the time of its suppression, has been too well settled and made familiar by recent decisions in this country and in England, in cases arising out of the events of the late rebellion, to require any statement of the principles upon which those decisions are founded. (United States v. Huckabee, 16 Wall., 434; Titus v. The United States, 20 Wall., 475; Sprott v. The United States, 8 C. Cls. R., 499, and 20 Wall., 459; United States v. McRea, 8 Law Rep. Eq., 69; United States v. Prioleau, 2 Hem. & M., 559, and 44 Law Jour. Rep., 7; Elphinstone v. Bedreechund, 1 Knapp Priv. C. C., 329; The King of the Two Sicilies v. Wilcox, 1 Sim., 301; Halleck’s Int. Law, 837-839; Dana’s Wheaton §§ 30, 347, n.; 3 Lawrence’s Commentaires sur les Uléments du Droit International, 423.)
The claimant’s counsel does not deny that such is the well-settled law, but he attempts to draw a distinction upon which he urges that it does not apply to the facts in this case., He admits in his argument that the United States became the successors to and the owners of all personal property actually in possession of the Confederate government, such as arms in the *247 hands of its soldiers and ships commanded by its officers, but he maintains that where the United States claim title to property through a contract of sale by a citizen to the Confederate gov-erment, they cannot set up such contract, even though executed, because it was made against public policy, and void. We cannot admit the correctness of that position. The right of the United States to the property is equally valid in either case. In the latter case, where proper claimed to have been owned by the Confederate government is found in the hands of private parties who set up title to it in themselves, the fact of ownership by the Confederate government may be proved by a bill of sale as well as by any other competent evidence. The individual claimant cannot be allowed to prove that he purchased the property of the Confederate States, because he had no right, as against the United States, to make such purchase, nor can he repudiate his own sale to them, whether he gave a bill of sale or not, which is immaterial, because, having sold his property and received the full consideration therefor, he cannot retain both, nor repudiate a sale which inures to the benefit and not to the injury of the United States, and the enforcement of which under such circumstances violates no principle of public policy.
We are referred to Sproitfs Case, (8 C. Cls. B., 499,) wherein the petitioner claimed title to cotton as against the United States through a sale to him by the Confederate government, and the court held as conclusions of law upon the facts therein stated—
“ 1. The government of the Confederate States was an unlawful assemblage, without corporate power to take, hold, or convey a valid title to property, real or personal.
“ 2. The claimant was chargeable with notice of the treasonable intent of the sale by the Confederate government, and the transaction was forbidden by the laws of the United States, and wholly void, so that the claimant acquired no title to the property which is the subject of suit.”
On appeal the Supreme Court (20 Wall.) affirmed the second conclusion of law, but did not pass upon the first. It does not follow, as here contended, that because the purchase of property of the Confederate government by a citizen of the United States was void and no title passed thereby, therefore an executed sale of property to that government would be equally ■void as against the United States, and the latter would acquire *248 no title thereto as successors to the rebel government. To so hold would be to allow a person to take advantage of his own wrong, and to set up his own illegal act to defeat the rights of the very party against whom that wrong was committed. The first conclusion of law in Sprotfs Case is perhaps too broadly stated taken by itself, but when considered in connection with the facts in that case, as it should be, it is sufficiently evident that the meaning is that the Confederate States could not take, hold, or convey property as against the United States. That was all the court was called upon to decide; and, thus understood, the decision of that case, both in this court and in the Supreme Court, is against the petitioner’s claim in this case.
The petitioner is not entitled to recover, and his petition is dismissed.