Howey, J.,
delivered the opinion of the court:
The vicissitudes attending this proceeding have arisen from' inattention to the rules of practice and disregard of the ordinary laws of evidence. The methods adopted in presenting-the matter have imposed some unnecessary labor upon the court, of small moment, however, compared with the needless delay and possible injury to the one party or the other in making up the record.
In the present situation the ultimate facts which the evidence is intended to establish probably do not sufficiently appear; that is, though the findings are the result which the competent evidence in the case proves, the ultimate facts which Congress have a right to consider can not he found because the evidence which apparently exists has not been offered to the court in competent form. It therefore becomes necessary to remand the cause for the production of other ascertainable evidence, and in the meantime to advert to the law applicable to the facts and the relation of the facts to the law, to the end that Congress may determine the effect of the claim as a proper charge against the United States on all the facts.
The range of inquiry into legal questions is narrow indeed in a proceeding like this; but where the issue is of mixed character, depending upon law and fact, the design of the statute will best be subserved by referring to the law inci *203 dental to the settlement of the. facts — all the more important so to do because in a proceeding where ultimate facts only are to be reported the court is without jurisdiction to finally fix legal rights or liabilities by rendering judgment.
As against the United States the claim had its origin in the presentation of a bill offered to the Forty-sixth Congress reciting that under an act of the legislature of the State of West Virginia passed March 3, I860, a board was created for the examination of certain military claims for enrolling, equipping, subsisting, and paying the forces of the State called into service after June 20, 1861, to act in concert with the forces of the United States; that the board audited and found due by the State $18,974.68 as due to certain citizens; that by an act passed February 25, 1871, the sum of $19,474.68 was appropriated to pay the sums audited, including $500 for expenses of the board, and that the last act contained a proviso that only such claims as were recognized by the United States should be paid out of the amount appropriated; that the sum found due had not been paid by the State, but if paid would constitute a proper charge against the United States. This bill was in substance again offered to the Fiftieth Congress and referred to this court under the provisions of the act of March 3, 1883 (22 Stat. L., 485), as amended by section 14, chapter 359, of the act of March 3, Í887 (24 Stat. L., 405).
The amended petition recites these acts, together with a subsequent act of the legislature passed February 19, 1897, by which it. appears that on March 27, 1897, the governor appointed an agent to disburse the money so appropriated to certain persons claiming the same or to their personal representatives.
Submitted nearly four years ago, the court found the facts in the cause. On a motion for rehearing and to amend more elaborate findings were filed to be certified. They establish (1) that the men whose names "appear upon the company lists exhibited are not shown to have been- properly mustered in or enrolled into the military service of the State of West Virginia for and during the periods of time covered by said lists, and that the records of the State do not show that the men were mustered in or enrolled at all; (2) that they were not mustered into the service of the United States during those *204 periods; (3) that the time of anj^ actual service is not made to appear; (4) and that no proof of payment of any claims audited by the military board is shown. No proof was offered at the previous hearing tending to establish actual payment.
After full findings claimant again moved to amend, accompanying that motion with a prayer for another hearing. Rehearing being granted, the record is again submitted with the suggestion that important facts not presented to the court on the previous hearings have come to the knowledge of the attorney prosecuting the cause. This relates, it would seem, to the alleged payment of the amount under the State appropriation, and explains previous efforts to obtain an alternative finding that “the State had paid or secured to be paid the claims for the alleged servicies.”
Present Government counsel, retying on the admission of his predecessor that the money appropriated by the State had been disbursed, and that no further defense existed, recites the admission of payment and the want of further defense, but asks the privilege of being heard on any phase of the case which may seem necessary to the court.
In the present state of the records the findings can not be changed because the evidence is substantially the same. It would be useless to repeat what has already been found.
It is hot the duty of the court in the ordinary course of business to suggest to those prosecuting claims how to proceed. Neither is it incumbent upon the court to defeat the consideration of meritorious claims by technical objections, but in this class of cases to inquire into every material fact necessary to be presented to Congress to enable that body to act with intelligence upon any report sent to them.
Congressional cases will be remanded in the sound discretion of the court at any time before final report if the court is satisfied that material evidence exists and should be produced to define the rights of the parties or give to Congress more authentic information.
The requests now before the court proceed upon the theory that the State having paid the men must be reimbursed “as provided by law.” There is no provision of law which makes reimbursement by Congress mandatory, even if the State has made payment. Unless the men were for the time claimed *205 duly enrolled as soldiers of the State or rendered actual service within the meaning of the act of Congress of 1866, hereinafter cited, any payment by the. State to the men was apparently a gratuity which Congress may adopt by reimbursing the State if it sees fit to make a similar donation.
But the fact, of pa3rment on the present submission is yet unproven. The affidavit offered in support of such a material allegation is incompetent. The principles of the law of evidence govern in cases referred under the acts of 1883 and 1887, supra, as in other cases. Information for Congress must be ascertained in strict conformity to the rules of judicial procedure from competent and admissible evidence taken by authority of law. (Allen's case, 28 C. Cls. R., 141; Vance v. United States, 30 C. Cls. R., 252; Le More v. United States, 35 C. Cls. R., 9.) So essential is it to the due administration of justice that these principles be observed we have only recently declined to consider evidence, appearing in certain depositions on the waiver of the Assistant Attorney-General of the signature of the witnesses to each page of the deposition as required by the rules of the court. (Ind., No. 9941, Sanchez v. United States.)
The act of 1883 commonly called the Bowman Act includes a section intended to relieve Congress of a special class of cases now disappearing from the calendars of committees and the dockets of the court.
Regarding the usefulness of this statute as impaired to the extent of any deviation from the rules which obtain in the production of evidence in all judicial proceedings, the court will continue to insist upon the strict application of these rules, leaving the determination of the legal right to Congress on all the facts. (Dockery's case, 26 C. Cls. R., 148.)
The fact that Congress may be willing to make an appropriation independently of legal considerations does not alter the duty of the court to ascertain the truth according to established methods. These exclude from consideration letters and e,e parte statements of every character, whether sworn to or not, in all cases where the statute does not direct that they be received.
Nor can the allegation of actual payment be established by the proceedings of the local military board. The proceedings *206 of that board were ex parte and based apparently upon muster rolls only, made up long after the alleged enlistments. Even if those proceedings constituted judicial action, as claimant insists, the United States were not parties thereto, and hence not bound by anything the board did.
Under an act approved June 21, 1866, 14 Stat. L., 68, Congress provided for the payment of all troops called into service by the governor of West Virginia. That act excluded any allowance for troops who did not perform actual military service in concert with the authorities of the United States. The commissioners authorized to be appointed to ascertain ■the amount of money expended by the State had at their command an appropriation estimated to be sufficient to paj' everything the State claimed for the payment of its troops. The presumption, then, is that the men whose claims form the basis of this proceeding were paid from the $368,548.37 then appropriated to pay the State in full or that they did not perform any service (possibly not at all) within the meaning of the act of the State legislature appropriating the moneir. In any event they do not account nor does the State account for the failure to claim for the alleged service for many jrnars after its rendition.
Subsequent to the period of time indicated by the lists on file most of the men were regularly enrolled in the service of the State and of the United States. For this service they were paid.
But for the time claimed the men seem to have been allied as voluntary local associations, under the obligation of obedience to no authority and without officers with commissions from any source. Though it is shown that some of the men were utilized in a skirmish, it is not certain which of them were thus used or how many were so engaged. JSIot enlisted during the time for which the claims were made, they were never in camp, and their service in point of time quite indefinite. Styling themselves scouts and home guards, the record discloses that they would meet and disband, then come together and go home again, all the time claiming the privileges and exercising the rights of citizens, but at no time subject to orders eitler of the State or the United States as soldiers or fighting men even of a militia reserve.
*207 The exhibits among the papers purport to be original muster rolls. One of the companies numbered 11 men, while another numbered 18 men. The West Virginia act of July 23, 1861, provided that no companj' should consist of less than 50 nor more than 100 men, rank and file. That act also required persons becoming members of a volunteer company to take an oath to support and defend the Constitution of the United States and the State government as reorganized by the convention which assembled at Wheeling June 11, 1861. Officers of companies properly organized were required to transmit to the governor the proper certificate of election, together with the duplicate of an agreement signed by the members of the company, accompanied b3r a proper certificate or certificates that the officers and privates of the company had taken the oath required by the ordinance for the reorganization of the State government, passed on June 19,1861, at Wheeling, provided that all officers and privates of the volunteer companies of the State not mustered in the service of the United States should take an oath prescribed before proceeding to the discharge of their several duties.
On the record, as it stands, no proof has been adduced to show that the men were properly mustered or enrolled as members of the respective companies, as set forth in the exhibits on file.
The period covered by C. Adkin’s supplemental list and the period covered bjT his regular muster roll are the same, but none of the names upon the supplemental list are found upon the regular muster roll of his companjn
Alltop’s company was organized and enlisted December 10, 1863, for the period of one year. The period covered by Alltop’s supplemental list is subsequent to the period for which the men on the regular muster roll of his company were enlisted and mustered into service. The names upon the supplemental list are not the same as the names upon the regular roll of his company. There is nothing to show that the 18 men upon this supplemental list ever formed a company at all according to law.
The parties are directed to address themselves to the proof of the following matters: (1) The service of the men within the meaning of the act of Congress approved J une 21, 1866, *208 14 Stat. L., 68; (2) the time of any actual service of the men by companies and by the individuals appearing upon the lists on file, if such actual services were rendered; (3) the causes operating upon the delay in presenting claims for the alleged services; and, (4) payment by the State, to whom and when, and if not to the original claimants whether payments were made to the administrators of the deceased parties.
An abstract of the evidence will be filed by claimants accompanied by the certificate of defendants under the rule respecting the correctness of the abstract.
The requests must embocty the ultimate propositions which the evidence is intended to establish and not the evidence on which the ultimate facts are supposed to rest, so that the findings will have the sufficienc3r and perspicuity of a special verdict.
The cause will go to the general docket for further testimony in accordance with the foregoing directions.